Filed 5/18/26; Certified for Publication 5/29/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.L., a Person Coming Under the Juvenile Court Law. | B348185 |
| | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 20CCJP03930 |
| Plaintiff and Respondent, | |
| v. | |
| J.A., | |
| Defendant and Appellant. | |

APPEAL from the findings and order of the Superior Court of Los Angeles County, Juan M. Valles, Juvenile Court Referee. Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

**INTRODUCTION**

Father J.A. challenges termination of his parental rights to his son K.L. pursuant to Welfare and Institutions Code[1] section 366.26. He asks us to conditionally reverse and remand the matter because the Los Angeles County Department of Children and Family Services (DCFS) did not satisfy its initial duty of inquiry to ascertain whether there was reason to believe K.L. had Indian ancestry. Specifically, Father contends that because DCFS failed to interview maternal grandmother, its inquiry did not satisfy the demands of the Indian Child Welfare Act of 1978 (ICWA), (25 U.S.C. § 1901 et seq.) and its California counterpart (§ 224.2 et seq.). We affirm.

A. *Procedural Background*

On July 24, 2020, DCFS filed a petition pursuant to section 300 on behalf of four-year-old K.L. and his four older half-siblings. (The half-siblings are not involved in this appeal so we will not further discuss their cases.) The petition alleged the children were at substantial risk of physical harm because Mother had a history of illicit drug abuse, was a daily user of methamphetamine and amphetamine, and had tested positive for those drugs on July 15, 2020. It also alleged that on prior occasions Mother was under the influence of illicit drugs while the children were under her care and supervision. On July 29, 2020, the court detained K.L. from his mother. K.L. was placed with his half-siblings at the home of their maternal aunt.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

At the jurisdictional hearing on September 18, 2020, neither parent appeared. Their whereabouts were unknown. The court sustained the petition, declared K.L. a dependent of the juvenile court, removed him from Mother's custody, ordered him suitably placed, and ordered monitored visitation and reunification services for Mother. Mother made her first appearance at the six-month review hearing on March 18, 2021. She was eight months pregnant. The review was continued to April 9, 2021. The court continued reunification services for Mother. Mother gave birth on June 2, 2021. The baby tested positive for amphetamines, was detained and placed with her siblings in the home of the maternal aunt. At the 12-month review hearing on October 27, 2021, neither parent appeared. Parents' whereabouts were unknown. The juvenile court found that Mother's progress with her case plan had not been substantial; it terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26.

As of April 27, 2022, Mother's whereabouts were still unknown, although the social worker had a new cell phone number for her. On May 13, 2022, Father made his first appearance and on July 6, 2022, the court ordered paternity testing which showed Father is K.L.'s biological parent. On October 26, 2022, the court found Father was K.L.'s biological father, ordered monitored visitation, and ordered the maternal aunt not to act as monitor. The court denied Father's request for presumed father status.

Father filed a section 388 petition on October 31, 2022, asking the court to grant six months of reunification services and visitation with K.L.. He advised the court he had previously been

homeless and unable to participate in proceedings, but now he had a home and sufficient stability to participate in reunification services. On March 1, 2023, the court granted Father's section 388 petition and ordered six months of reunification services with random drug testing, a domestic violence course, parenting education, and individual and conjoint counseling. The section 366.26 hearing was taken off calendar.

At review hearings on September 29, 2023 and March 29, 2024, the court found Father's progress with the case plan was substantial and ordered continued services. However, at a review hearing on November 1, 2024, the court found Father's progress had been partial (he had stopped and shortened regular visitation with K.L.), terminated reunification services, and reset the permanency planning hearing pursuant to section 366.26.

The section 366.26 hearing was held on August 12, 2025. The court found by clear and convincing evidence that K.L. was likely to be adopted and no exception to adoption applied. The court terminated parental rights. Father timely appealed.

## B.  *ICWA*

Besides his parents, K.L.'s only biological family members referred to in the record are the maternal grandmother, paternal grandmother, maternal uncle, and maternal aunt. Both parents signed Juvenile Council form ICWA-020 indicating that neither they, K.L. nor his relatives were members or eligible for membership in an Indian tribe, none were residents of or domiciled on a reservation, and none possessed an Indian identification card indicating membership or citizenship in an Indian tribe. On March 18, 2021, the juvenile court found ICWA did not apply. Maternal aunt denied Indian ancestry. A close friend of the family, Linda G, denied Indian ancestry. K.L.'s

4

medical provider and occupational therapist were asked if they had information; they did not. The paternal grandmother denied Indian ancestry. Maternal uncle denied Indian ancestry in his family. The only extended family member not successfully contacted about Indian ancestry was maternal grandmother. The juvenile court concluded that DCFS's initial inquiry was sufficient and found no reason to believe K.L. had Indian ancestry.

As to maternal grandmother, DCFS obtained a telephone number for her, but the phone number was disconnected. The social worker asked maternal aunt for the maternal grandmother's contact information, but the maternal aunt did not provide it. Maternal aunt said she had to speak with the maternal grandmother first before giving any information. The record reflects no follow-up in this regard.

## DISCUSSION

Father contends DCFS should have done more to reach maternal grandmother to make a complete inquiry. He argues DCFS's unsuccessful effort to make contact with maternal grandmother warrants conditional reversal of the order terminating his parental rights. We disagree.

A. *Applicable Law*

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of

5

Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883, superseded by statute on other grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147; see 25 C.F.R. § 23.107(a) (2024).)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian

6

children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2); *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567.)

DCFS has an "affirmative and continuing duty to inquire whether" a child in dependency proceedings is or may be an Indian child. (§ 224.2, subd. (a).) This includes an initial duty to ask extended family members, among others, if they have "any information that the child may be an Indian child." (§ 224.2, subd. (b)(1).) Extended family member means the child's "grandparent, aunt or uncle, brother or sister, brother-in-law, or sister-in-law, niece or nephew, first or second cousin, or stepparents." (25 U.S.C. § 1903(2); see also (§ 224.1, subd. (c)(1) [adopting ICWA definition of "extended family member"].)

However, DCFS has an obligation to contact only those extended family members who are "reasonably available." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1140; *In re Claudia R.* (2025) 115 Cal.App.5th 76, 81.)

7

B.    ***Standard of Review***

A juvenile court's finding that a social service agency conducted an adequate initial inquiry into whether a dependent child is an "Indian child" within the meaning of ICWA is affirmed if it is supported by substantial evidence, "even if the agency did not inquire of everyone who has an interest in the child." (*In re Dezi C., supra,* 16 Cal.5th at p. 1141. We review the juvenile court's finding regarding the adequacy of the inquiry and ICWA's applicability with deference. (*Id.* at pp. 1140–1141, 1144.) The juvenile court's fact-specific determination is a quintessentially discretionary function. (*Id.* at p. 1141.) On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent. (*Ibid.*)

C.    ***Analysis***

Father's appeal focuses on one person: maternal grandmother. Father claims maternal grandmother was reasonably available because shortly before the dependency proceedings started, maternal aunt would leave the children at the maternal grandmother's home after picking them up from school when Mother failed to do so. According to Father, all DCFS had to do to track her down was ask for information from maternal aunt, Mother, and K.L.'s half-siblings who had lived with her intermittently before the case commenced in 2020.

DCFS did contact maternal aunt who declined to give out maternal grandmother's information without her permission. Maternal aunt stated she would follow up, and she apparently did not. It cannot be said that Mother was reasonably available to be interviewed about maternal grandmother's whereabouts as

8

Mother herself disappeared early on in these proceedings. She appeared in court on March 18, 2021, and then four years later via Webex on February 28, 2025, and August 12, 2025, when her sixth child, a newborn, was detained and placed with maternal aunt. She never appeared again. And we cannot countenance asking K.L.'s half-siblings, minor children themselves, for personal information about their maternal grandmother when the maternal aunt had already told DCFS that she required maternal grandmother's consent to give out her personal information.

We decline to put the onus on DCFS to independently track down family members, like maternal grandmother, who are not involved in the dependency proceedings and for whom DCFS had no good contact information. Nor do we expect DCFS to hound family members who say they will supply contact information, but do not do so. Indeed, DCFS is not required to "cast about" for investigative leads. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.) DCFS is required to "ask an added question of extended family members whom [they] often already are investigating in their usual court of work." (*In re S.S.* (2023) 90 Cal.App.5th 694, 704–705.) Where, as here, DCFS spoke to the parents, all known paternal relatives and two out of three known maternal relatives (the third being maternal grandmother), the inquiry was sufficient. (*In re K.G.* (2025) 117 Cal.App.5th 379, 382, 384–385 [failure to contact four relatives after inquiring of 13 other relatives is sufficient initial inquiry].)

9

## DISPOSITION

The findings and order of the juvenile court are affirmed.


STRATTON, P. J.

We concur:



WILEY, J.



VIRAMONTES, J.

10

Filed 5/29/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.L., a Person Coming Under the Juvenile Court Law. | B348185 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03930) |
| Plaintiff and Respondent, | |
| v. | |
| J.A., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on May 18, 2026, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____
STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.